UNITED STATES of America, Appellee,

v.

Patrick COLE, Defendant, Appellant.

No. 86–1183.

United States Court of Appeals,
First Circuit.

Argued Sept. 5, 1986.

Decided Dec. 11, 1986.

Robert J. Wheeler with whom John C. McBride and Francis T. O'Brien, Jr. were on brief for defendant, appellant.

S. Theodore Merritt, Asst. U.S. Atty., with whom William F. Weld, U.S. Atty., was on brief for appellee.

Before CAMPBELL, Chief Judge, BOWNES and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

In this rather bizarre case, defendant-appellant Patrick Cole appeals a denial of his motion to dismiss the indictment and motions to suppress the fruits of wiretap evidence and evidence seized from his home. Cole was charged in a multiple count indictment with conspiracy to possess and possession of cocaine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1) and § 846. The indictment also charged Cole with three counts of the unlawful use of a telephone to facilitate the commission of a drug conspiracy in violation of 21 U.S.C. § 843(b). The indictment was based primarily on information obtained from a duly authorized wiretap of Cole's telephone. There were three other codefendants, only one of whom, Joan Adamson, figures in this appeal.

The basis for the motions to dismiss the indictment and suppress evidence was that one of the investigating officers, Detective Charles Bradley, had engaged in a romantic affair with codefendant Joan Adamson, Cole's live-in companion, both before and after the indictment. Both Bradley and Adamson admitted that they became ro-

mantically entangled during the preindictment investigation of defendant and that their affair continued after defendant and Adamson were indicted. After the extent of the affair became known to the prosecutor, the charges against Adamson were dropped.

The district court held a *Franks v. Delaware*[1] hearing to determine whether the failure to disclose the affair between Detective Bradley and Adamson in the wiretap application vitiated the wiretap. It found that it did not. After the district court denied defendant's pretrial motions, he entered a plea of guilty conditioned on his right to appeal the adverse rulings.

The issues before us are whether the affair deprived defendant of due process, interfered with his right to counsel, vitiated the need for a wiretap on defendant's phone and poisoned all the fruits evidence resulting from the wiretap. Defendant also claims that the court erred in limiting the cross-examination of Bradley on the length of the affair.

## I. THE FACTS

Sometime in 1982 or 1983, the Northboro Massachusetts Police Department began to suspect that defendant was a drug dealer. On April 6, 1984, Detective Bradley executed a search warrant on defendant's residence in Northboro. As a result, charges of illegal possession of weapons and cocaine were filed against defendant in the Westboro District Court. Defendant, who had been a part-time police officer on the Northboro Police Department in 1976, was given a two-year suspended sentence in return for his promise to cooperate with Bradley on other drug investigations. Defendant himself continued to be under investigation. In January, 1985, an investigation into cocaine trafficking by defendant was commenced by the Drug Enforcement Administration (DEA) in conjunction with police officers in the Northboro area, including Detective Bradley.

As part of the investigation, Bradley telephoned defendant at Patrick's Body Shop. Defendant's residence, which he shared with Adamson, was located over the Body Shop. When defendant was not at home, Bradley talked to Adamson who took messages for defendant. Bradley and Adamson became telephone acquaintances. In the middle of April, 1985, Bradley asked Adamson to meet him in person, partially because he had enjoyed talking to her on the phone and also because he hoped that she would be a source of information about defendant's drug dealing activities. Bradley informed his superiors and fellow officers that he was going to try to cultivate Adamson to obtain information about defendant. Adamson knew Bradley was a detective investigating defendant. She told him repeatedly that she did not know anything about drug activities by the defendant and that she would not cooperate in the investigation of defendant.

Early in May, 1985, the relationship between Bradley and Adamson culminated in sexual relations. Thereafter, sexual liasons took place from time to time in defendant's home when defendant was away. Bradley estimated that he was in defendant's residence from twelve to fifteen times. While there, he had an opportunity to observe defendant's sophisticated security system which consisted of surveillance cameras, TV video monitors and a sequential relay board. Bradley testified that he never saw any drugs or drug related materials at defendant's home.

As the affair continued, Bradley and Adamson expressed their love for each other. This did not deter Bradley from inquiring about defendant's drug activities, nor did it change Adamson's insistence that she knew nothing about such activities and would not help Bradley in his investigation. Both stuck to their principles.

In the beginning of August, 1985, DEA Special Agent Kathleen Bennett, with whom Bradley had been working, began preparing an affidavit for a Title III wiretap on defendant's phone. Bradley then

---

**1.** 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

stopped seeing or contacting Adámson. He did not tell Agent Bennett of his affair with Adamson and it was, therefore, not included in the wiretap application. An application for an order authorizing a pen register on defendant's telephone was made and granted on August 19, 1985. On September 9, an application was made for an order authorizing a wiretap on defendant's phone; it was granted the same day. Agent Bennett's wiretap applications included a great deal of information supplied by Bradley.

On September 24, Agent Bennett submitted an application for a search warrant of defendant's residence. The information in the affidavit came from the phone wiretap. The warrant was issued and a seizure of cocaine, scales and other cocaine paraphernalia were seized. Defendant and Adamson were arrested after the execution of the search warrant.

Bradley and Adamson renewed their affair after her arrest and she subsequently became pregnant. Bradley was married throughout this period.

## II. THE MOTION TO DISMISS THE INDICTMENT

### A. *Due Process*

The basis of defendant's claim that he was deprived of due process is that Bradley's affair with Adamson was so egregiously improper that it should bar prosecution. He relies on statements, mainly dicta, culled from Supreme Court cases.

The first case on which defendant relies is *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). Russell was convicted of manufacturing an illegal substance. He claimed entrapment because a DEA agent supplied him with one of the ingredients. The Court affirmed, finding that since Russell was predisposed to manufacture the drug, there

was no entrapment. The language on which defendant relies is:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, *cf. Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the instant case is distinctly not of that breed.

*Id.* at 431–32, 93 S.Ct. at 1642–43. Nor is this case of such a breed. Likewise, we find no help for defendant in Justice Frankfurter's concurrence in *Sherman v. United States*, 356 U.S. 369, 378–85, 78 S.Ct. 819, 823–27, 2 L.Ed.2d 848 (1958), which is a careful analysis of the basis of the entrapment defense. The instant case simply is not an entrapment case. Defendant equates Bradley's conduct with that of the police in *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), which the Court found "shocks the conscience." *Id.* at 172, 72 S.Ct. at 209. The police in *Rochin* broke into defendant's home without a warrant, assaulted him, and then took him to a hospital and had his stomach pumped out against his will. Bradley's affair with Adamson cannot be equated with such conduct.[2]

We find no grounds for a due process violation of defendant's rights in the affair between Bradley and Adamson. We agree with the district court that there is a real question as to who seduced whom. Indeed, if we take the parties at their words, there was no deliberate seduction by either one; Bradley and Adamson fell in love with each other and entered into sexual relations. This is not an uncommon occurrence in this age or any other. While we do not condone the conduct of Detective Bradley, there was nothing done by him

---

**2.** Defendant cited a Florida case, *State v. Eichel*, 495 So.2d 787 (Fla.Ct.App., 2d Dist.1986), in which the court upheld the dismissal of an indictment on the grounds that obtaining evidence by the use of sex was improper police conduct and "beneath the dignity of the state."

This opinion was reversed en banc, however, in a decision dated September 17, 1986, and the case remanded for a jury determination of whether there had been entrapment under Florida law.

that deprived defendant of due process of law.

## B. *Interference with Defendant's Right to Counsel*

The second reason advanced by defendant for dismissing the indictment is that Bradley interfered with defendant's right to counsel. Following the indictment of defendant and Adamson and the imprisonment of defendant, Bradley and Adamson renewed their affair. During this time, Bradley disparaged the attorneys who were representing defendant and Adamson. The district court stated:

> Based on the affidavits and motion papers before it, this Court is prepared to infer that Detective Bradley, during the period following the indictments of Adamson and Cole, intentionally pursued a course of action designed to interfere with those defendants' Sixth Amendment right to counsel and that such conduct is fully binding on the United States.

The court, however, found that there was no demonstrable prejudice to defendant. We agree.

■ Bradley's disparaging remarks had no effect on defendant, assuming that they were relayed to him. Because defendant and Adamson were represented by attorneys who were partners in the same law firm, the district court held a hearing pursuant to Federal Rule of Criminal Procedure 44(c).[3] The court fully and meticulously explained to both defendant and Adamson the risks involved in being represented by members of the same law firm. By the time of the hearing, the defendant must have been aware that Adamson's affections were at least shared with Bradley. Defendant chose to keep the attorney whom he had retained originally. And that

attorney has capably represented defendant through this appeal. We affirm the district court's finding that Bradley's disparagement of defendant's counsel to Adamson did not result in prejudice to defendant.

The next question is whether, in light of the district court's finding that Bradley "intentionally pursued a course of conduct designed to interfere with [defendant's] Sixth Amendment right to counsel," the indictment should have been dismissed as a matter of law for prophylactic purposes. The Supreme Court teaching prohibits a dismissal on purely prophylactic grounds.

In *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), an undercover agent, unknown as such to defendant and his attorney, attended a meeting between defendant and his attorney. The agent did not attempt to obtain any information for the prosecutor, nor did he relay any information to the prosecutor. The Court of Appeals for the Fourth Circuit held that attending the meeting amounted to a *per se* violation of defendant's right to effective assistance of counsel and a fair trial. The Supreme Court rejected this "prophylaxis" approach and found that because there was "no tained evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment...." *Id.* at 558, 97 S.Ct. at 845.

An even stronger case is *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). In *Morrison*, federal agents, fully aware that defendant had been indicted on drug charges and had retained counsel, met with her without her attorney's knowledge. The purpose of the meeting was to seek her cooperation in a

---

**3.** Federal Rule of Criminal Procedure 44(c) provides:

> (c) **Joint Representation.** Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

related investigation. The government agents disparaged defendant's counsel and told her that she would gain various benefits if she cooperated, but faced a stiff jail term if she failed to cooperate. Defendant refused the agents' overtures and notified her attorney of what had transpired. The agents visited defendant again in the absence of counsel. "At no time did respondent agree to cooperate with them, incriminate herself, or supply any information pertinent to her case. Contrary to the agents' advice, respondent continued to rely upon the services of the attorney whom she retained." *Id.* at 362–63, 101 S.Ct. at 666–67. The district court denied defendant's motion to dismiss the indictment. As here, there was a conditional plea of guilty while defendant appealed. The Third Circuit held that, whether or not defendant had been prejudiced, her sixth amendment right to counsel had been violated and dismissed the indictment with prejudice. The Supreme Court, in a unanimous opinion, reversed. It held, "absent demonstrable prejudice or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." *Id.* at 365, 101 S.Ct. at 668. (footnote omitted).

Since there was no demonstrable prejudice here, there is no ground for dismissing the indictment.

## III. THE WIRETAP APPLICATION

The wiretap application made no mention at all of the Bradley-Adamson affair. Defendant argues that this omission, particularly that Bradley was in defendant's home twelve to fifteen times when defendant was away, violated two subsections of 18 U.S.C. § 2518(1)(c) and (3)(c). Section 2518, which establishes the procedure for interception of wire or oral communications, requires that a wiretap application include, *inter alia,* "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" § 2518(1)(c). The statute further

provides that a judge may issue an ex parte order for a wiretap if he determines on the basis of the facts submitted that, *inter alia,* "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" § 2518(3)(c). It is defendant's position that if the clandestine visits of Bradley to defendant's home had been included in the wiretap application the strictures of § 2518(1)(c) and (3)(c) would have prevented the wiretap order from being issued.

There can be no question that "[j]udicial wiretap orders must be preceded by applications containing prescribed information, § 2518(1). The judge must make certain findings before authorizing interceptions, including the existence of probable cause, § 2518(3)." *United States v. Giordano,* 416 U.S. 505, 514, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974). This is because wiretaps should be used only if necessary. Necessity, however, does not mean that the government must exhaust all other investigative procedures before resorting to a wiretap. The requirements of § 2518(1)(c) and (3)(c) are "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974); *United States v. Santarpio,* 560 F.2d 448, 452 (1st Cir.), *cert. denied,* 434 U.S. 984, 98 S.Ct. 609, 54 L.Ed.2d 478 (1977); *United States v. Scibelli,* 549 F.2d 222, 226–27 (1st Cir.), *cert. denied,* 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977).

The district court, fully aware of the problem raised by the omission in the application, held a hearing pursuant to the requirements of *Franks v. Delaware,* 438 U.S. 154 (1978), to determine whether the omission was material and, if it were, would the order still have issued. It found that, although the information withheld was "not insubstantial," it was not material. The court's findings on materiality deserve quoting:

Materiality means if the statements had been made and what we know today after two days of hearing, had been in the affidavit, would the warrant necessarily, nevertheless, have issued. If it would have issued even though we knew these things, the information is immaterial. If this Court would not have issued the warrant had it known of Bradley's romantic involvement with Adamson and all the circumstances that we now know, then it is material and the wiretaps and all information deriving therefrom must be suppressed. The Court rules it's not material. It's not material because the Court finds that from all the circumstances that Ms. Adamson was not, given the nature of the conspiracy here, the use of the telephones, the surreptitous delivery and apparent movement of the cocaine, she was not the means for breaking open the conspiracy. On at least one occasion she evidenced her unwillingness, out of a fear of retaliation, to make statements inculpatory of Cole. Therefore, the Court rules that even had it known all the information that it now has, the standards set forth by Title 19, Section 2518 1(c) would have been met and the warrant would have issued.

The court went on to point out that the application "detailed in an appropriate and careful manner ... all those reasons why an appropriate way to investigate this conspiracy was through wiretaps."

This circuit's standard of review of wiretap application is well defined:

" 'It is not our province to engage in *de novo* review of an application; instead, we "test it in a practical and commonsense manner" to determine whether the facts which it sets forth are "minimally adequate" to support the findings made by the issuing judge.' *United States v. Smith*, 726 F.2d 852, 864 (1st Cir.1984), citing and quoting *United States v. Southard*, 700 F.2d 1 (1st Cir.1983), and *United States v. Scibelli*, 549 F.2d 222 (1st Cir.1977)."

*United States v. Bynum*, 763 F.2d 474, 476 (1st Cir.1985). In reviewing findings made after a *Franks* hearing, we apply the clear-ly erroneous test. *United States v. Southard*, 700 F.2d 1, 10 (1st Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

■ We have read carefully the wiretap application and the testimony adduced at the *Franks* hearing. We find that the district court properly applied the test required under *Franks v. Delaware*, made no clearly erroneous findings of fact and that the facts set forth in the application were more than adequate to support the issuance of the wiretap orders. This ruling makes it unnecessary to discuss the validity of the search warrant issued for defendant's residence since it was challenged only on a "fruits" basis.

## IV. THE CROSS–EXAMINATION ISSUE

■ There is one final issue, whether the district court committed reversible error in refusing to allow defense counsel to question Detective Bradley about the post-indictment renewal of his affair with Adamson. Defendant argues that Bradley had a vested interest in seeing to it that he was convicted and imprisoned. He points to an affidavit of Adamson in which she stated that Bradley had commented to her that they both would be together after defendant was convicted and imprisoned. Bradley, in his affidavit, denied making this comment. Defendant argues that the Adamson affidavit raised substantial questions about Bradley's credibility and that since the comment was allegedly made during the couple's post-indictment relationship, cross-examination about it should have been allowed.

We point out first that the court did allow defense counsel to question Bradley about his post-indictment relationship with Adamson. Tr. 2, 18–19. It was defense counsel's attempts to cross-examine again on this topic that were rebuffed.

"Trial courts are granted broad discretion to control the scope of cross-examination." *United States v. Silvestri*, 790 F.2d 186, 190 (1st Cir.1986) "Only in exceptional circumstances will reversible error be found in the district court's determination of the probative value of testimony in a

particular case." *United States v. Kepreos,* 759 F.2d 961, 964 (1st Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985).

Bradley was cross-examined extensively at the hearing on all the facts and nuances of his preindictment affair with Adamson. We fail to see how dredging up more details about the renewal of the sexual liason would have affected Bradley's credibility. It was already clear that he let his emotions override acceptable moral standards. Even if everything Adamson said, both by affidavit and testimony, were accepted and Bradley's statements completely rejected, the result would be the same. The testimony of Adamson and Bradley was to a large extent consistent. The basic question was not credibility, but whether what both admitted had transpired adversely affected defendant's right to due process, assistance of counsel and the wiretap application. For the reasons stated, we find that it did not.

*Affirmed.*